Good morning, Your Honors. May it please the Court, John Landry on behalf of Appellant Bofi Federal Bank. I'll reserve five minutes for rebuttal. Given the fullness of the party's briefing, I would like to focus on three issues. First, the undisputed evidence that supported the bank's same-action defense. Second, the absence of emotional distress evidence traceable to alleged retaliation during the relevant period when the plaintiff was a bank employee. And finally, the jury's excessive damages award. At trial, the bank's same-action defense was based on a simple premise. The plaintiff never returned to work at the bank after his medical leave expired. He just never came back. The bank's absenteeism policy provided that if an employee fails to report to work or to call in for three consecutive calendar days, he will be considered to have abandoned his job and will automatically be terminated. Counsel, wasn't there evidence in front of the jury that there were other employees returning from medical leave who did things similar to the plaintiff who weren't terminated? No, there was not, Your Honor. No evidence that Earhart was treated differently from other attorneys, I mean, other employees returning from medical leave? There was evidence that reminder notice or reaching out to coordinate the return for medical leave didn't occur in the plaintiff's case. So that didn't happen, but there was evidence that that did happen with other employees. There was evidence that that was considered to be the normal process. I don't know if there was evidence that it happened with others, but there was testimony that the leave coordinator, the medical leave coordinator, had a process to do that. So given the evidence, which in the light most favorable to the plaintiff demonstrated that there was significant unhappiness in some quarters at the bank with what the plaintiff had done, why wouldn't the evidence of some different treatment allow a jury to reject as they did this defense? Well, if there was some unhappiness, if the environment was unfriendly, if there was hostility towards him, that would be very relevant to showing that the protected activity was a contributing factor to the termination. But here we're talking about a causation element, which is adjudicated independently of that. The question that is relevant is, would the employer retain an otherwise identical employee who had not engaged in the protected activity? And our argument here today is that that test, when applied by its plain terms, required that the jury find that the same action test was met. And so I can continue to answer the question. If you're looking for, well, wasn't there some causal impact in the failure to reach out and remind him? Didn't that affect whether he appeared for work or not? That's a causation question. That answer was clear. It did not. It did not account for his failure to report the first day he was supposed to be back, the second day, or the third day. He never came back. No, but couldn't the jury have found, based on the evidence here, that notwithstanding the fact that this was the policy, what the bank did where somebody had been out on medical leave was do everything that they could to make sure that the people were over their medical leave, got back, were integrated to make sure they weren't having continuing problems, et cetera, so to do everything or to act reasonably to get them back into the workforce? And couldn't the jury have looked at that and said, that wasn't what happened here. This was a guy who was uncovering snakes under rocks, and we want him out, and we wouldn't have done it to people who weren't uncovering snakes under rocks. I believe, Your Honor, they could conclude that we want him out. They could conclude that there was animosity towards him, animus, but that is a separate inquiry from the same action defense question, and it didn't explain why he never came back, and that was what the defense rested on, which was whether or not he had notice, he never returned. The absence of notice did not explain his failure to not come back, and it's 16 consecutive business days elapsed before the formal termination notice was delivered to him, and the jury got to hear that evidence and understand that there was no explanation for his failure to return other than abandonment of the job. The evidence also showed that he knew that his medical leave was expiring, that he knew he needed to get an extension of medical leave certification in order to extend it. He never did that. He knew he needed to return, and he never returned. So, based on that evidence, which was, those are pretty fairly extreme facts here about a person just walking away and not coming back. Now, he might have had reasons to not come back. He might have thought that the environment was unfriendly towards him, but he never advanced that theory of the case. He never said that he was constructively discharged and felt too uncomfortable to return. That was clearly not in this case. So, what we were facing was job abandonment, and that was the independent ground on which he was terminated, and the bank, there was clear and convincing evidence. In fact, it was more, it was highly probable, highly probable that the bank would have not retained an otherwise identical employee who had not engaged in protected activity. Am I right that the bank did not have evidence of any such other case, though? Like, the bank didn't say, here are the five other employees we fired when they didn't come back to work. That's correct, Your Honor, but I would not suppose that that evidence existed. This is, you know, fairly unusual for someone to not report to work for three consecutive calendar days and not call in, not call in at all. You wouldn't expect the history of that at the bank. Perhaps people want to work at the bank. They call in. The ease with which people can call in and report that they're going to be absent would not allow a past history to develop, perhaps. So, I can't speak to that necessarily, but I would not assume that such history exists. Counsel, could you address the significance of the Sarbanes-Oxley Act's anti-retaliation provision? Yes, I can, Your Honor. The Sarbanes-Oxley Act's anti-retaliation provision allows the plaintiff to establish a prima facie case. And so, when you get to the prima facie stage, which we're not contesting, the plaintiff has already established that the bank does not want him back, that there is animus, perhaps, towards him, that his protected activity contributed to his termination on a prima facie level. But it's the second step that allows the defendant to overcome that. And the policy evidence, the evidence that he was out for 16 consecutive days unexplained, those are extreme facts. And the evidence that he was fully aware of what was going on and did not need a reminder, did not need anyone reaching out to him, established the defense. In other words, it overcame the prima facie case. And it was exactly, precisely, the type of evidence that Congress envisioned when it adopted a burden-shifting framework that would have two steps, just like this one had. Counsel, is it your view that the degree of the alleged animus is irrelevant in the calculus, or that that is something the jury can consider in deciding whether your client would have done the same thing? That is, one isolated incident of animus that could get you to your prima facie case is the same as 10 incidents of animus. Is that something the jury can consider in deciding whether your client met its burden of showing by clear and convincing evidence that it would have fired him no matter what? No, it wasn't the degree of animus or the number of incidents or any of the quality or the quantity of evidence that established the element that the protected activity was a contributing factor. That went to the element of intent. What was the open issue that remains, even with that evidence, is ultimately the causation test that Congress crafted. And your honor, that test is a hypothetical. So the strength of the prima facie case is irrelevant? The prima facie case is the first step. No, I understand, but it's not relevant. I am answering your question. It's not relevant, yes. Correct. And so, unless there are other questions, I'd like to go on to the second point, which was the insufficiency of the evidence supporting damages for the retaliation. There was a lack of emotional damages evidence in this case. If you look, the sum total of plaintiff's emotional distress testimony is set forth on just a few pages of the trial transcript. Now, plaintiff says he had severe anxiety, he had sleepless nights, he had difficulty breathing in episodes where he threw up. But you would search in vain for any place in the record where he actually links this anxiety and these symptoms to an actual retaliatory act during the relevant employment period. You would have expected him, rather, to have immediately linked his anxiety to his June 9th termination. But remarkably and surprisingly, he didn't do it. Instead, he identified a source that was not related to the period of his employment. What he did was, he pointed specifically to the origination point for it that was five months after his employment ended. It was October 2015, and it was during an investor call that the CEO of the bank was conducting. And there were certain statements that were made on that call that he testified caused him to fear that the bank would engage in post-employment adverse acts against himself and his loved ones. So, he affirmatively identified an origin for his emotional distress that was not related to retaliation. Based on that origin, and based on that testimony, there was just not sufficient proof that tied any anxiety that he testified to or that others testified that they observed to the retaliation. This was important because it speaks to the excessive nature of the award. Even if we were to assume that there were some anxiety and symptoms that were traceable and were connected to actionable retaliation, that traceable balance would be de minimis in light of Mr. Earhart's testimony here, because he said it began in 2015 with this conference call. Then, when the bank sued his mother and sued his girlfriend, it accelerated and it spiraled. So, counsel, let me direct you to the mom's testimony. And I'm looking, I think, at ER 2000. Mom testified, he's not the same. I don't think he'll ever be the same. He doesn't carry the same confidence. He's very timid. It's just something a mother knows about her child. And then followed by, did these differences start when he lost his job? And the answer was, counsel objected, but the district court overruled the objection. And the answer was yes. So, doesn't that tie these to the time frame you're saying his testimony may not have? If mom is saying these started right when he lost his job, isn't that at least some evidence tying it to the time frame? Your Honor, it's not evidence of the anxiety and the symptoms that he testified to. If you look at what the mother is saying, she's saying she noticed that he was less confident and timid. Now, she did state, as you stated, that it began with the employment. But Mr. Earhart has to be the expert of his own anxiety and his own symptoms. And his testimony was absolutely clear that it did not begin at the end of the employment. It began in October of 2015. The mother is observing these traits, which I would characterize as quite different than emotional distress suffered by Mr. Earhart in the sense that he is less confident and timid. But even if there was some evidence, even if that's considered to be some evidence, Your Honor, what it shows is how thin that evidence is. We have a million-dollar jury award that rests on it. And the case of Bell v. Williams has stated that exceptional awards, what this million-dollar award is, requires a very detailed testimony that we don't have or other supporting documentation, which we don't have here. The evidence of his symptoms and his anxiety was re-thin. He never identified the severity of his breathing difficulties. He never testified whether he had four instances of throwing up or 40. There was no indication of how many sleepless nights occurred. He testified that he found employment three weeks after the June 9th termination. There was no evidence that it interfered with any part of his life in pursuing other opportunities. He didn't obtain any medical treatment for this. There's no evidence that he and received psychological counseling for this. He stipulated that it was garden-variety emotional distress. And the comparative cases we pointed to are cases in which courts have admitted large damages award tremendously for garden-variety emotional distress. We submit- We were to somehow agree with you. Are you suggesting, as you sit here today, new damage trial, remittitor? What are you suggesting? I'm suggesting, Your Honor, that remittitor, that the district court, that the judgment be reversed, that the district court offered the plaintiff a choice between a new trial or an acceptance of a remittitor at an amount that is supported by the evidence. The million dollars was not. We have the discretion, if we were to hypothetically agree with you, to either set our own remittitor amount or set a maximum remittitor amount. If, theoretically or hypothetically, we were going to do the latter, considering- Are you talking here just about the emotional distress? Are you talking about the defamation number, too? I'm talking about the emotional distress, damages only. Okay. So, if we were going to do a remittitor, theoretically or hypothetically, on the emotional distress, what would your number suggest be if we were going to set it or set a maximum? It would be a number less than $200,000, Your Honor. Thank you. I will reserve the rest of my time, if I may. I have very little time. Okay. So, now we'll hear from Ms. Gillum for the ability. Thank you, Your Honor. May it please the Court. We are here today to defend the verdict that a San Diego federal jury awarded Mr. Earhart on the very verdict form that the appellant fought so hard for. It was one that listed several bases or predicates for each cause of action. That document is at 15 ER 2968. It is a verdict form that proves the jury understood their solemn duty and they performed it well by choosing two predicates for the Sox claim, Sarbanes-Oxley, out of three on the form, by choosing a single basis for defamation out of four possibilities on the verdict form, by awarding but a fraction of the damages that Mr. Earhart sought. And on that verdict form that the defense fought for, the jury rejected the same decision defense every single time for each claim against which it was possible. They rejected the substantially true defense to defamation. They rejected the litigation privilege defense to defamation. And they rejected every single one of the six counterclaims the bank brought against Mr. Earhart. And then, of course, we are here because the court denied their motions to overturn the verdict and get a new trial. And I'm sure you've spent plenty of time looking at Judge Cynthia Basham's very carefully written 27-page opinion that she issued nine months after the briefing was concluded. It was a masterful summary of the evidence and the law that supported her rulings. Now, the bank acknowledges what the standard of review is here, and that's a hard one for them to overcome. But then they proceed to distort, to dispute, and to deny the inconvenient facts that supported the verdict and the ruling and lead us here today. So correctly stating the standards of review, that's about the only accurate statements that I could find in the first 15 pages of their brief. They proceeded then to repeatedly violate the standards of review. They kept describing evidence favorable to the bank that was directly contradicted by the jury's findings. And they ignored crucial evidence that supported the verdict, as the trial court also ruled. Over and over and over again, they did this throughout their briefing. Did they think that if we told them, if they told us their fantasy version of the trial enough times that someone would accept and believe it? Well, certainly Judge Basham didn't. And as she said, from start to finish, the jury heard conflicting narratives about what happened during Earhart's tenure at the bank, including the reasons for his termination. Indeed, a considerable portion of Earhart's case was presented through BFI's current or former employees, putting credibility determinations front and center. That's at 1 ER 8. And that credibility was of the very highest officers of the bank that was on trial and found wanting. And by contrast, at page 21 of their brief, the bank's fantasy version says, quote, simply put, the objective and uncontroverted facts unquestionably showed that BFI would have taken the same action it took on June 9, 2015, absent the alleged protected activity. So can I ask you, do you have an explanation of why he didn't go back to work after the medical leave? Yes, he testified that he thought he believed he was fired. By the time April came around, he thought he had already been fired, because he was told on March 6 that they were delivering a letter to him to terminate him, that the bank was sending the police after him to retrieve the laptop. So he had every reason in the world to the bank. And no one was reaching out to him to say, hey, forget about what we did in March. Now we really want you to come back. That never happened. So nothing- Do you have a page for where that testimony is, where he says that's why he didn't come back? I didn't notice that. Yes. Let me have a minute to get back to that and continue on some other points, and I will find that. All right. So the same decision in defense. This is really the heart of the case that they put on. The instruction was proper. They don't argue anything is wrong with the instruction itself. The jury was allowed to consider all evidence, as we do in all termination cases, all the facts and surrounding circumstances, which includes the March 6 attempted termination, the frantic efforts to get his laptop, even involving the bank CEO. How extraordinary that the CEO of a publicly traded bank is getting involved in trying to get a laptop back from what he called a junior underperforming auditor. The OCC attorney telling Mr. Earhart at that time in March that the bank was calling the police on him, San Diego police. And Mr. Tola, the trial, that it was the CEO who was behind getting the police to come after him. That same man, Tola, breaking into the cabinets on March 6, seeing the memo that Mr. Earhart had written about the CEO's wrongdoing, directing the bank to terminate him a few hours after he didn't show up for work on a single day. And remember, the evidence showed he did call in. His original, the boss he would normally have called, of course, had walked out the day before. So he called the that was next in charge, Sabrina, and told her he was off sick that day. And she then informed Mr. Tola. So he knew. This was not a no call, no show. He knew that he had called off sick. And remember the evidence that was then in the hands of senior bank management at the time of these two terminations, plenty for the first one and even more for the second one. They knew of his numerous complaints of wrongdoing. He made them not only to his boss, Mr. Ball, but also to Mr. Tola. They knew, of course, that Tola had made the threat that really made him very nervous about that he would get bitten by a snake if he kept turning over rocks. That the general counsel of the bank, extraordinary, ordered Mr. Earhart to remove a finding from an audit, a finding that said the bank was violating a penal code statute and why remove it? Because it might be discoverable in a class action suit against the bank. All this evidence is building up in Mr. Earhart's mind and as he worries about whether the things he's uncovering will ever see the light of day. So they knew he had written that memo about CEO wrongdoing because the morning of March 6th, they had broken into his cabinets and found it. They knew he had gone to the OCC right after he didn't come into work to report his findings after Mr. Ball walked off the job the day before. And they knew that Mr. Earhart had filed a detailed OSHA complaint as a predicate for his SOX claim in mid-April. They were served with it and they had drafted a response. All that happened before the June 9 termination. And then, of course, we have the evidence of how very differently this termination was handled than others. The head of human resources said the bank had never ever collected a laptop from someone who went out on medical leave, much less someone who simply called off sick for a single day. Remember, that's when they started trying to get the laptop on March 6th. He went to the doctor on March 9th. And the leave coordinator, she said, yes, the normal practice is that we will reach out to an employee on leave and remind them that they're due to return and to you know it will be seamless. None of that happened here. So, in short, the same decision defense fell flat over and over. The bank simply did not follow the standard practices they claimed to have. The jury was not required to look at the June 9 termination in isolation. They were entitled to look at all the facts that led up to it. The jury didn't buy it. The trial court didn't buy it, and nor should this court. They didn't really focus much on the other lawsuit, so I guess I won't address that issue. But I do want to talk about the emotional distress damages because, again, Counsel for the Bank has a fancy version of what happened at trial. Mr. Earhart testified when did his anxiety begin? The morning of March 6th. That his symptoms were considerable. Where does he say that, that it started? Where is the page for that? That he had never... That his symptoms started the morning of March 6th? I mean, I know he was sick on March 6th. Yes. With the emotional distress for being terminated, where does he say that it started? Where is that testimony? All right, I'll get these page numbers for you in just a moment. See if I have somebody watching who can help pull them up out of the 3,500 pages. We'll get them. The bank tries to argue the facts of other cases to dispute the verdict, in particular this Bell case that they only brought up in a reply brief, which is not proper. But that one is so completely unhelpful to them. It's about less than two minutes that a prisoner was being transferred from one cell to another, and how the damage award was too high. In this case, for five years of symptoms, including his loss of self-confidence, his personality change, $1 million is well within the jury's discretion to award. On the defamation claim, the numerous ways the CEO called him incompetent at his job on an investor call, that investor call record is permanent. Anybody can go and look at that, for as long as the SEC keeps records on the company, and see what he said about Mr. Earhart over and over again, how he was inefficient, unproductive, wrong, incompetent, doing work he wasn't supposed to do, out of his depth, and so on. The jury also saw the boss, Mr. Ball, who really knew Mr. Earhart's work product, who said it was good, his written work product among the best. He had no write-ups. He had no performance improvement plans. He had no threats of termination. And of course, he had seen, and the jury saw, a lot of the emails Mr. Earhart wrote, and they could judge for themselves. He writes pretty articulate, understandable emails. The harm, again, the counsel for the bank tried to suggest that the harm to him that he was complaining about didn't come until long after the termination. That simply was not true. He had reputational harm. I guess they're not really challenging the $500,000 for that, which they had raised in their brief, so I won't address that one either. But I can summarize this before I get to those page numbers for you, as what Judge Basham said. I called it a fantasy version of the trial. She said it a little more politely. Quote, ultimately, BFI's motion, quote, rests not on a lack of substantial evidence, but on its own interpretation of that evidence. And now, if you will allow me a minute to pull up those pages. Counsel, before you pull up specific pages, I'd like you to address the remitter argument that was made by Bell. All right. Obviously, I don't think there should be any remitter by this court, because his emotional distress was, in fact, something that began while he worked there, as he testified, and as his mother supported. They're trying to tie it to the defamation that occurred months later, after this lawsuit was filed. But that was another evidence of harm that the jury gave an award for. But the $1 million in emotional distress, I think, is fully backed by the record. And I would strongly resist any temptation to counteract what the jury saw, what the judge saw. This case went on for four weeks, and people saw Mr. Earhart every single day. And they got to judge, as Judge Basham did, that that $1 million number was appropriate and well-supported by the evidence. Thank you, Counsel. Thank you. Now, if you'll give me a minute, let me see here. All right. All right. I was hoping somebody was watching from my office who would have supplied me those page numbers. Well, Counsel, I had looked through the pages that you cite at page nine, the bottom of your brief. And pretty much the only thing that I found was at ER 905, where your client testified, quote, I also thought I had been fired on March 6th. Yes. I don't see anything in the pages that are cited at the bottom of page nine that directly goes to your client believing prior to, as a reason he didn't call in or anything, that he believed he had been fired. But, I mean, my looking may not have been complete. Is this the primary thing on which you rely, or do you have a recollection even without a page number? Without a page... No, please, go ahead. Yes. He was being asked on the stand about April when he filed the OSHA complaint, and he was asked about his status at the time, and he said he believed he had been terminated. Okay. I'll look for that, too. Thank you. Counsel, let me suggest that you can submit to the court clerk the page sites you're referencing. I really appreciate that. It's very hard to do it while I'm here in this courtroom, virtually or otherwise. Thank you. The court will not make a final decision for a while. Can you give an estimate as to about approximately when you'd have those by? By tomorrow. Okay. Okay. Thank you. Thank you. I see I have more time left, but unless you have questions, I'll submit. Okay. Well, I don't have questions, but Judge Cleveland or Judge Bendis may have questions. Thank you for asking, Judge Gould. Okay. Now, we have some time for Mr. Landry to make a rebuttal argument. Thank you, Your Honor. So an employee who believes he's been terminated does not apply for medical leave and extend that medical leave, and I don't believe you'll find the testimony that says that he believed he was terminated at the time when he was supposed to return to work. That's the first thing. The second thing, there was a reference to the district court's ruling based on credibility determinations. The same action defense that we're relying on is not based on any testimony. There are no credibility determinations at issue there. So it was actually surprising to see the district court say that, and I think that shows that there was a conflation of the two steps of the burden-shifting framework in that instance. In addition, going to the issue of the lack of emotional distress evidence, to the extent that there's any testimony that the plaintiff here had any anxiety the morning of March 6, 2015, he did not know at that time that there was going to be an attempt to terminate him. So there's no connection between any anxiety then and any retaliatory act, and that's consistent with our position that there was insufficient evidence on that point. Thank you, Your Honors. Okay. This case will now be submitted, and the parties will hear from us in due course. I think the court will now take a brief recess before returning for the last argument. The court stands at recess.
judges: GOULD, FRIEDLAND, BENNETT